SPS

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

**Sunita Kulshrestha vs.  Shady Grove Reproductive Science Center PC**
**CL-2022-0016357**

TO:     **Shady Grove Reproductive Science Center PC**
**AP Corporate Services Inc**
**Registered Agent**
**252 N Washington Street**
**Falls Church VA 22046**

**SUMMONS – CIVIL ACTION**

The party upon whom this summons and the attached complaint are served is hereby notified
that unless within 21 days after such service, response is made by filing in the Clerk's office
of this Court a pleading in writing, in proper legal form, the allegations and charges may be
taken as admitted and the court may enter an order, judgment or decree against such party
either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on December 9, 2022.

JOHN T. FREY, CLERK

By: _____
                    Deputy Clerk

Plaintiff's Attorney:  Broderick C. Dunn

EXHIBIT 1

SPS

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

### PROOF OF SERVICE

**Sunita Kulshrestha**
    **Plaintiff**
**VS**

**PC**
  **Shady Grove Reproductive Science Center PC**
    **Defendant**

**CL-2022-0016357**
**Subtype:  Summons & Complaint**
**Serve: Shady Grove Reproductive Science Center**

STATE OF_____

CITY/COUNTY OF_____, to wit:

This day _____

personally appeared before the undersigned Notary Public in and for the City/County and State

aforesaid, and, having been first duly sworn according to law, deposes and states as follows:  that

he/she is not a party to, or otherwise interested in, the subject matter in controversy in the within

cause, that he/she is over the age of 18 years; that on the _____ day of _____, 20___, at

_____ o'clock _____.m. he/she served the within Complaint,  in person, on the Defendant

_____ at_____

_____

_____ and the Defendant  is / is not  a

resident of the State of Virginia.

_____
                AFFIANT              TITLE

Subscribed and sworn to before me in my City/County and State aforesaid, this

_____ day of _____, 20_____.

_____    Notary ID #: _____
       NOTARY PUBLIC          My Commission expires:_____

**IN THE CIRCUIT COURT FOR FAIRFAX COUNTY**

FILED
CIVIL INTAKE

2022 DEC -5 P 2: 14

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | |
|---|---|
| SUNITA KULSHRESTHA, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| SHADY GROVE REPRODUCTIVE SCIENCE | ) |
| CENTER, P.C., | ) |
| | ) |
| **SERVE:**   AP Corporate Services, Inc. | ) |
| Registered Agent | ) |
| 252 N Washington Street | ) |
| Falls Church, Virginia 22046 | ) |
| | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

2022   16357

Civil Case No. _____

## COMPLAINT

NOW COMES the plaintiff, Sunita Kulshrestha, M.D. ("Plaintiff" or "Dr. Kulshrestha"), by and through her undersigned counsel, Broderick C. Dunn, Esq., Philip C. Krone, Esq., Maria E. Stickrath, Esq., and the law firm of Cook Craig & Francuzenko, PLLC, and for her Complaint against the defendant, Shady Grove Reproductive Science Center, P.C. ("Defendant" or "Shady Grove Fertility"), states as follows:

1.       This case is a civil action involving: 1) Breach of Contract; 2) the Virginia Whistleblower Protection Law, Va. Code § 40.1-27.3; 3) Defamation Per Se; and 4) the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq.* ("FMLA").

## JURISDICTION AND VENUE

1

2.      This Court has jurisdiction over this matter pursuant to Va. Code §8.01-328.1 because, among other reasons, Defendant resides and transacts business in the Commonwealth.

3.      Venue is proper in this Court pursuant to Va. Code §8.01-262 because, among other reasons, Defendant regularly conducts substantial business activity in Fairfax County, Virginia.

## PARTIES

4.      Plaintiff is an adult resident of the Commonwealth of Virginia.

5.      Defendant is a Maryland stock corporation which qualified to do business in Virginia on March 13, 2020 and is classified under "Practitioners of Healing Arts." Shady Grove Fertility was founded more than thirty (30) years ago and is "a Center of Excellence in the field of reproductive medicine, IVF, and infertility." Upon information and belief, Shady Grove Fertility is the largest fertility practice in the United States, with more than 900 physicians and employees.

## FACTUAL BACKGROUND

6.      Plaintiff graduated with honors and a bachelor's degree in molecular biology from Massachusetts Institute of Technology (MIT). She then pursued her medical degree at the University of Pennsylvania School of Medicine where she graduated at the top of her class.

7.      Dr. Kulshrestha did her residency in obstetrics and gynecology at the University of Virginia. She then completed a three (3) year fellowship in reproductive endocrinology and infertility at the Hospital of the University of Pennsylvania.

8.      Plaintiff is board certified in obstetrics and gynecology and is subspecialty board certified in reproductive endocrinology and infertility.

9.      From 2001 through July of 2014, Plaintiff was a physician at the Genetics and IVF Institute in Fairfax, Virginia.

2

10.    Based on Dr. Kulshrestha's reputation and proven track record of success, Defendant approached her in late 2013 to recruit her to join Shady Grove Fertility.

11.    At the time, Plaintiff was living in Vienna, Virginia and had an arduous restrictive covenant with her then-employer which banned her from working within 75 miles of the Capital Beltway for two (2) years.

12.    Defendant's then CEO, Mark R. Segal ("Mr. Segal") lured Plaintiff to Shady Grove Fertility with the false promise that "[e]veryone [at Shady Grove Fertility] becomes a partner" and that Defendant supported its physicians in that endeavor.

13.    Mr. Segal also assured Plaintiff that she would make $1,000,000 per year once that happened.

14.    On or about January 15, 2014, Plaintiff and Defendant entered into a Physician Employment Agreement (the "Contract"). The Contract was a specialty contract as evidenced by the language on page 11 of the Contract stating that "the parties have hereunto set their hands and seals as of the date first above written." The Contract is attached hereto as **Exhibit A**.

15.    Plaintiff uprooted her elderly parents, left her husband in Virginia, and moved to the Philadelphia area where she could wait out her restrictive covenant. Plaintiff saw patients at Defendant's offices in Chesterbrook and Bala Cynwyd pursuant to Schedule A of the Contract.

16.    Pursuant to Section 9 of the Contract, it had an initial term of six (6) months but "shall be extended automatically each year, unless 180 days prior notice not to renew is given by either party, for a period of four (4) years, on the same terms and conditions…"

17.    Pursuant to Schedule B of the Contract, the section which dealt with Plaintiff's initial compensation, Defendant was obligated to pay Plaintiff $30,000 per year under its Retirement (Defined Benefit) Plan.

3

18.     Defendant breached the Contract by not paying Plaintiff $30,000 in 2017 and in 2018 under its Retirement (Defined Benefit) Plan.

19.     In March of 2017, Dr. Kulshrestha moved back to the Commonwealth of Virginia and began servicing Defendant's patients at its Waldorf, Maryland location.  Plaintiff also regularly performed services at Defendant's Fairfax County location near INOVA Fairfax Hospital.

20.     Despite no longer working or seeing patients in Pennsylvania, the Contract is the only employment agreement ever executed by Plaintiff and Defendant.

21.     After returning to the Washington D.C. Metropolitan Area, Plaintiff experienced a number of personal tragedies.

22.     Plaintiff's husband and romantic partner of twenty (20) years died unexpectedly in March of 2018.

23.     Plaintiff and her husband are both only children, so Plaintiff was left to care for her elderly parents and in-laws after her husband's death.  Thus, Plaintiff was responsible for the care and well-being of four elderly adults.

24.     Less than a year after losing her husband, Plaintiff's father died unexpectedly in early 2019.

25.     Eight months after Plaintiff's father's unexpected death, her father-in-law also died.

26.     In the spring of 2020, Plaintiff realized her longtime dream of becoming a mother.

27.     During a period where Plaintiff was left caring for her mother-in-law and her elderly mother in her home and parenting an infant, Plaintiff's performance at Shady Grove Fertility continued to exceed Defendant's legitimate expectations.

4

28.     Plaintiff maintained a full patient load, increased revenue year over year, facilitated close relationships with referring physicians, and achieved high patient satisfaction scores.  In fact, Plaintiff performed better than many of her colleagues in terms of revenue, patient satisfaction and patient medical management.

29.     In August of 2021, Plaintiff's mother experienced a health crisis.  Rather than cancel new patient consults, Plaintiff continued to do telemedicine appointments via video and/or telephone from her home in Virginia.  All consultations throughout Shady Grove Fertility were telemedicine due to the ongoing pandemic.

30.     Plaintiff requested that she be able to do telemedicine appointments from home for a short period of time as a reasonable accommodation because of the ongoing pandemic and her mother's health challenges.  Plaintiff further requested to convert two (2) in-person procedure days to telemedicine consult days.

31.     On August 23, 2021, Plaintiff had a zoom call with Amy Davis ("Ms. Davis"), Defendant's Regional Executive Director, and others.  During that call, Plaintiff again requested that she be able to take up to two weeks working from home so that she could care for her mother.

32.     Plaintiff had not exhausted her vacation leave and wanted to continue telemedicine appointments from home.

33.     When Plaintiff asked about potentially engaging in FMLA leave, Ms. Davis expressed concern that Plaintiff was "doing three full-time jobs at once...mom to a fifteen-month-old, caregiver to [her] mother, and full-time physician."

34.     Plaintiff rebuffed Ms. Davis' comments and asked if she was being treated differently in violation of state and federal equal employment laws and statutes based on her gender and caregiver status.

35.     On August 30, 2021, one week after Plaintiff engaged in protected activity by seeking FMLA leave and other reasonable accommodations, Ms. Davis and the head of human resources for Defendant's management company, Randy Ammons ("Mr. Ammons"), notified Plaintiff that Defendant was terminating her employment on February 27, 2022.

36.     When Plaintiff asked why Defendant was terminating her employment, Mr. Ammons responded that Defendant's Board terminated her because "it was not a good fit" and that it was "without cause."

37.     Dr. Kulshrestha subsequently received a Notice of Termination on August 30, 2021. The Notice of Termination is attached hereto as **Exhibit B**.

38.     The Notice of Termination stated in part that "pursuant to [Plaintiff's] Employment Agreement dated January 15, 2014, notice is hereby provided that your employment with Shady Grove Reproductive Science Center, P.C. will terminate on February 27, 2022."

39.     While Plaintiff's employment did not officially terminate until February 27, 2022, starting in October of 2021, Plaintiff became aware that Defendant's agents were telling patients, employees, and colleagues in the reproductive medicine space that Dr. Kulshrestha "retired from Shady Grove Fertility."

40.     Defendant's agents also informed former office supervisor, Ashli Gardner ("Ms. Gardner") that "Dr. Kulshrestha was terminated by Shady Grove Fertility for performance reasons." Ms. Gardner repeated this to other physicians in the reproductive medicine space, including Dr. Pierre Asmar.

41.     As of November 26, 2022, Defendant maintains a web page featuring Plaintiff, which states the following:

> Effective October 8, 2021, Sunita Kulshrestha, M.D., has retired from Shady Grove Fertility.  The Waldorf office is actively directing the facilitation of Dr. Kulshrestha's

6

current and former patient care.  For any questions or concerns, contact the Waldorf office at 301-705-9923.

42.     The above-mentioned statement is false.  Plaintiff never "retired" from Shady Grove Fertility or from the practice of medicine.   The statement is available at https://www.shadygrovefertility.com/our-care-team/doctors/kulshrestha/.

43.     Defendant also impersonated Plaintiff and sent an email to patients stating the following in part:

> "I am sorry to announce my retirement from Shady Grove Fertility effective 10/8/2021. Due to family needs I am stepping away from my practice to care for their needs at this time…If you have further questions, please reach out to the team at the Waldorf office, Marisa Rogan…"

44.     As a result of Defendant's actions, Plaintiff has been and continues to be damaged. She suffers from loss of income, anxiety, depression, and a diminished professional reputation.

45.     Many of Plaintiff's colleagues in other reproductive medical practices have called Plaintiff to express sorrow that she is no longer practicing medicine.  Defendant's false statement that Plaintiff retired has prevented her from getting other jobs locally.

46.     Plaintiff is in her early fifties (50's) with two young children and bills to pay.  She cannot afford to retire.

## COUNT I.

### (Breach of Contract)

47.     Plaintiff restates and realleges the allegations contained in paragraphs 1-46 of the Complaint as if fully set forth herein.

48.     The Contract represents a valid, binding, contract between Plaintiff and Defendant.

49.     Defendant breached the Contract when it failed to pay Plaintiff $30,000 for the years 2017 and 2018 under its Retirement (Defined Benefit) Plan.

7

50.     As a result of Defendant's breach of the Contract, Plaintiff has been damaged in the amount of $60,000.

## COUNT II

### (The Virginia Whistleblower Protection Law, Va. Code § 40.1-27.3)

51.     Plaintiff restates and realleges the allegations contained in paragraphs 1-46 of the Complaint as if fully set forth herein.

52.     Plaintiff engaged in protected activity in August of 2021 when she sought to take leave under FMLA, reasonable accommodations, and when she reported that Defendant's treatment of her violated state, local, and federal equal employment opportunity laws.

53.     Defendant responded by informing her a week later that her employment was being terminated as of February 27, 2022.

54.     As a result of Defendant's actions, Plaintiff has incurred attorneys' fees, suffered loss of income, and endured harm to her professional reputation.

## COUNT III

### (Defamation Per Se)

55.     Plaintiff restates and realleges the allegations contained in paragraphs 1-46 of the Complaint as if fully set forth herein.

56.     Starting in October of 2021 and continuing until November 26, 2022, Defendant published false statements that "[e]ffective October 8, 2021, Sunita Kulshrestha, M.D., has retired from Shady Grove Fertility."

57.     The statement is false and prejudices her in her profession or trade by implying that she no longer practices medicine.  It also misstates the circumstances of Plaintiff's departure from Shady Grove Fertility's employ—she was terminated after engaging in protected activity.

58.     As a result of Defendant's defamatory statements, Plaintiff has suffered injury to her reputation, humiliation, and embarrassment.  She has also suffered financial losses as result of colleagues believing that she is no longer practicing medicine.

## COUNT IV

### (FMLA Retaliation)

59.     Plaintiff restates and realleges the allegations contained in paragraphs 1-46 of the Complaint as if fully set forth herein.

60.     Plaintiff engaged in protected activity when she contacted Defendant in August of 2021 to request FMLA paperwork.

61.     Defendant took an adverse employment action against Plaintiff when it notified her that it was terminating her employment shortly thereafter.

62.     Plaintiff's termination was causally connected to her intention to take FMLA leave to care for her elderly mother.

63.     As a result of Defendant's conduct, Plaintiff has suffered lost back pay, lost front pay, liquidated damages, and attorneys' fees.

WHEREFORE, the plaintiff, Sunita Kulshrestha, M.D., demands judgment against the defendant, Shady Grove Reproductive Science Center, P.C., as follows:

(a) For Count I in the amount of $60,000;

(b) For Count II in the amount of $1,000,000, plus Plaintiff's attorneys' fees and costs pursuant to Va. Code § 40.1-27.3;

(c) For Count III in the amount of $1,000,000 in lost back pay and front pay, plus $1,000,000 in liquidated damages;

(d) Plaintiff's attorneys' fees as provided by the FMLA statute;

9

(e) Pre-judgment interest, post-judgment interest, and all other further relief that this Court

deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

SUNITA KULSHRESTHA, M.D.

By counsel:

Broderick C. Dunn, VSB No. 74847
Philip C. Krone, VSB No. 87723
Maria E. Stickrath, VSB No. 96191
Cook Craig & Francuzenko, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
(703) 865-7480 Phone
(703) 434-3510 Fax
bdunn@cookcraig.com
pkrone@cookcraig.com
mstickrath@cookcraig.com
*Counsel for Plaintiff Sunita Kulshrestha, M.D.*

10





## PHYSICIAN EMPLOYMENT AGREEMENT

### Between

### Shady Grove Fertility Center of PA, PLLC,

### and

### Sunita Kulshrestha, M.D.

AGREEMENT entered into January 15, 2014 by Shady Grove Fertility Center of PA, PLLC, a Pennsylvania professional services corporation, with its principal place of business at 945 Chesterbrook Blvd., Chesterbrook, PA 19087 ("PC") and Sunita Kulshrestha, M.D. residing at 2026 Lord Fairfax Road, Vienna VA 22182 ("Physician").

## RECITALS:

PC specializes in gynecological services, treatment of human infertility, encompassing the provision of *in vitro* fertilization and other assisted reproductive technology  ("Infertility Services").

Physician is duly licensed to practice medicine in the jurisdictions of Pennsylvania, Maryland and Virginia, specializes in the provision of Infertility Services and has experience in infertility treatment including surgical skills required in the course of providing Infertility Services.

PC has entered into an agreement dated March 11, 1998 ("Management Agreement") with Shady Grove Fertility Centers, Inc. ("Management Company"), pursuant to which Management Company will provide certain management and administrative services as are more fully described in the Management Agreement, a copy of which will be provided to Physician upon request.

In order to further facilitate the provision of Infertility Services, PC desires to employ Physician and Physician desires to accept such employment, on the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the foregoing, and other good and valuable consideration set forth herein, the parties agree as follows:

## 1.     ENGAGEMENT.

PC hereby employs Physician and Physician hereby accepts such employment to devote substantially all of Physician's professional time, effort and ability to the

C:\Users\CustomerSlim\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\WU1R5MVN\Kulshrestha V2 red-lined for Mr. Segal 1 6 2014FINAL.docxC:\Users\segam\INTEGRAMED\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BN50FPX1\Kulshrestha V2.doc



P. 1/14

provision of Infertility Services including practice development under the terms and conditions contained herein and as the parties may agree from time to time. Notwithstanding anything in this Agreement to the contrary, Physician shall not be required, and PC agrees not to require Physician, to engage in any conduct or perform any services that interfere with Physician's independent professional judgment or other professional obligations.

2. **DUTIES.**

(a) Physician shall provide patient care and clinical backup as required to ensure the proper provision of Infertility Services to patients of PC at PC's office(s) at the two addresses set forth in Schedule A (the "Offices"), and/or such other locations as shall be mutually agreed to by PC and Physician. Physician agrees to devote substantially all of Physician's professional time, effort and ability to PC's practice development and the provision of Infertility Services under the terms and conditions contained herein and as the parties may agree from time to time. In connection therewith, Physician's duties shall include, but not be limited to, the following:

(1) Provision of patient counseling and medical examinations, performance of egg retrievals, embryo transfers, surgeries, including, but not limited to, microsurgeries and laparoscopies, and patient follow-up;

(2) Reviewing and evaluating clinical data on a routine basis and making specific recommendations for improving implantation rates and treatment outcomes;

(3) Maintenance of a thorough understanding of and proficiency in the application of the most current technologies (including both surgical and non-surgical techniques) relevant to Infertility Services and related medical high technology infertility procedures ("ART Technology"); and

(4) Development and implementation of educational outreach programs designed to facilitate the development of relationships with physicians in the obstetric/gynecology community and the dissemination of information pertaining to the availability of Infertility Services.

(b) Except as permitted by Section 3(b) hereof, Physician shall not, during the term of this Agreement, otherwise engage in the practice of medicine outside of PC without the express written consent of PC.

3. **COMPENSATION AND BENEFITS.**

(a) In consideration of the Infertility Services to be provided by Physician hereunder, Physician shall be compensated as provided on Schedule B attached hereto and made a part hereof.


P·2/14

(b)    All remuneration received by Physician in payment for any outside professional medical activities, other than board attendance fees and board memberships and Permitted Compensation Arrangements shall be accounted to and be the sole property of PC. Permitted Compensation Arrangements shall include any income derived from testimony for litigation-related proceedings, lectures, passive investments, fundraising, or writing where Physician does not render professional medical services and Physician may retain all such compensation without limit. In connection with board memberships and related board activities, Physician may retain up to $5,000 in the aggregate annually. Physician's engagement in outside professional medical activities shall require the express written consent of PC and shall not interfere in any way with the fulfillment of Physician's duties hereunder or diminish the quality of the Infertility Services rendered.

(c)    Physician shall receive the benefits provided for on Schedule B unless the stated written benefit plans of the PC provide for more generous benefits as they may be changed from time to time in the PC's sole discretion.

**4.    BILLING.**    All fees for Infertility Services rendered by Physician on behalf of PC hereunder shall be billed and collected by PC; provided, however, that pursuant to the terms of the Management Agreement, Management Company shall carry out billing and collection functions on behalf of PC. In consideration for the payment to Physician of the compensation described herein, all receivables and collections attributable to Infertility Services provided by Physician to PC patients shall become the property of PC, and Physician agrees immediately to turn over to PC any such fees received by Physician during the term hereof. Physician hereby authorizes PC, and/or Management Company on PC's behalf, to bill for Infertility Services provided hereunder and agrees to execute any and all assignments or other documents that may be necessary or appropriate to permit PC, or Management Company as its designee, to carry out all billing and collection functions. Physician agrees that Physician shall not submit bills for, seek remuneration for, or otherwise collect fees for Infertility Services provided hereunder. Physician shall look solely to PC for compensation for the Infertility Services provided hereunder.

**5.    MEDICAL STAFF PRIVILEGES.**    Physician hereby acknowledges that in order to provide Infertility Services to PC as herein required, Physician must be a member in good standing of at least one hospital accredited by the JCAHO (the "Hospital") within the geographic area of PC's offices. Physician promptly will initiate the appropriate credentialing process to obtain and maintain credentials with at least one hospital accredited by the JCAHO with the geographic area of PC's offices with such hospital privileges to be obtained by July 1, 2014 if not sooner. PC shall use reasonable efforts to assist Physician in maintaining such privileges. The failure of the Physician to maintain privileges at the Hospital in good standing shall be deemed a cause for termination of this Agreement except for a suspension of privileges that lasts for thirty (30) days or less.

6.    **PROFESSIONAL LIABILITY INSURANCE.**    PC shall obtain and maintain on behalf of Physician, professional liability insurance through a carrier and with such limits as PC shall reasonably determine from time to time.    Upon termination of Physician's employment, PC agrees to pay in full within thirty (30) days of her last day of employment with PC such amount as is determined by PC's insurance carrier to be the sufficient premium for coverage for claims made against Physician arising out of professional activities occurring during Physician's period of employment with PC, but which are reported after termination of employment, provided however if Physician terminates this Agreement pursuant to Section 10(a)(vi) prior to expiration of the Term of this Agreement Physician shall pay such amount for insurance coverage.    Such coverage shall be provided in such form and with such carrier and limits as PC shall determine from time to time and shall be subject to the terms and conditions of the insurance policies providing such coverage.    Upon request, PC shall provide evidence of such coverage to Physician on an annual basis.

7.    **COMPLIANCE WITH BYLAWS, RULES AND REGULATIONS AND POLICIES.**    Physician agrees at all times to comply with the written bylaws, rules and regulations of the Hospital and of its medical staff and the reasonable policies, directives, bylaws, rules and regulations of PC.    Physician acknowledges that PC shall have final authority over: (a) the acceptance or refusal to treat any patient; and (b) the amount of the fee to be charged for all Infertility Services rendered by Physician to patients of PC, so long as such fees are lawful and reasonable. Notwithstanding the foregoing, Physician may refuse to treat any patient whom Physician reasonably believes should not be treated based upon reasonable legal or medical concerns or otherwise exercise her independent professional judgment as may be required by the appropriate licensing body.

8.    **MEDICAL RECORDS.**    All medical records of patients to whom Physician provides Infertility Services or other medical services on behalf of PC during the term hereof shall be the property of PC.    A copy of any medical records of such patients will be made available to Physician upon request, in a timely manner, at Physician's sole cost and expense.

9.    **TERM.**    The initial term of this Agreement shall begin no later than six (6) months after execution of this agreement and shall terminate December 31, 2014 (the "Initial Term") unless earlier terminated pursuant to the provisions of Section 10.    After the expiration of the Initial Term, this Agreement shall be extended automatically each year, unless 180 days prior notice not to renew is given by either party, for a period of four (4) years, on the same terms and conditions as herein specified.

10.    **TERMINATION.**

(a)    This Agreement may terminate upon the occurrence of any of the following:

(i)    Termination of the Management Agreement for any reason if such agreement terminates without a successor agreement, or upon the termination of any successor agreement which terminates without a successor agreement;

C:\Users\CustomerSlim\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\WU1R5MVN\Kulshrestha V2 red-lined for Mr. Segal 1 6 2014FINAL.docxC:\Users\segam.INTEGRAMED\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BN50FPX1\Kulshrestha V2.doc



P.4/14

(ii)     Conviction of Physician of a felony or suspension, revocation or non-renewal of Physician's license to practice medicine in the relevant jurisdiction;

(iii)    Upon the mutual agreement of the parties.

(iv)    Upon the loss by Physician of Hospital medical staff privileges at the Hospital, as described in Section 5;

(v)     By either party upon a material breach of this Agreement by the other party; provided that the non-breaching party first gives the breaching party written notice of the breach, and the breaching party fails to cure the breach within thirty (30) days after such notice;

(vi)    By either party without cause upon giving the other 180 days' prior written notice.

(vii)   Upon death or, at the election of the PC, the "permanent disability" (as such term is hereinafter defined) of Physician. In either such event, this Agreement shall terminate immediately; provided, however, Physician (or Physician's legal representative, as the case may be) will be entitled to receive any accrued but unpaid compensation earned by Physician hereunder through the date of such event including a proportionate calculation of any bonus which otherwise may be due. For purposes of this Agreement, the term "permanent disability" shall have the meaning set forth in the long-term disability insurance policy or policies then maintained by Physician or PC, or if no such policy shall then be in effect, or if more than one such policy shall then be in effect in which the term "permanent disability" shall be assigned different definitions, then the term "permanent disability" shall be defined for purposes hereof to mean any physical or mental disability or incapacity which renders Physician incapable of fully performing the services required in accordance with Physician's obligations hereunder for a period of 120 consecutive days or for shorter periods aggregating 120 days during any twelve-month period.

(b)     Upon termination of this Agreement, as hereinabove provided, neither party shall have any further obligation hereunder except for:  (i) obligations occurring prior to the date of termination; and (ii) obligations, promises or covenants which are expressly made to extend beyond the term of this Agreement.



**11.     REPRESENTATIONS AND COVENANTS.**

Physician makes the following representations and covenants, the validity of which shall be a material term of this Agreement:

(a)     Physician holds a license, in good standing, and will remain licensed to practice medicine in the jurisdiction of Pennsylvania;

(b)     Physician is authorized by the United States Drug Enforcement Agency to prescribe all pharmaceuticals required in connection with the provision of Infertility Services;

(c)     There are no professional disciplinary proceedings or malpractice actions threatened or pending against Physician, and Physician has notified and will promptly notify PC of any such professional disciplinary proceedings and the dispositions thereof;

(d)     Physician has notified and will promptly notify PC of all malpractice          actions brought

(e)     Physician shall at all times act in compliance with all applicable written policies and procedures of PC as reasonably communicated to Physician, as well as all applicable federal, state, and local laws, rules and regulations.

**12.     CONFIDENTIALITY OF INFORMATION.**

(a)     Physician agrees to keep confidential and not to use or disclose to others (except in connection with the fulfillment of Physician's duties hereunder) any Infertility Information, as defined herein, during the term of this Agreement or during any extension or renewal thereof, and for a period of one (1) year thereafter, except as expressly consented to in writing by PC and Management Company.   For purposes of this Agreement, the term "Infertility Information" shall mean such technical, scientific, and business information provided to Physician by PC or Management Company which is designated by PC or Management Company to be confidential or proprietary.   Infertility Information shall not include information which: (i) is or becomes known in the scientific community through no fault of Physician; (ii) is learned by Physician from a third party legally entitled to disclose such information; or (iii) was already known to Physician at the time of disclosure by PC. Physician further agrees that should his or her contractual relationship hereunder terminate, he or she will neither take nor retain, without prior written authorization from PC and Management Company, any papers, patient lists, fee books, patient record files, or other documents or copies thereof or other Infertility Information of any kind belonging to PC or Management Company, as the case may be.

(b)     Without limiting other possible remedies available to PC for the breach of this covenant, Physician agrees that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting bond, cash or

C:\Users\CustomerSlim\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\WU1R5MVN\Kulshrestha V2 red-lined for Mr. Segal 1 6 2014FINAL.docxC:\Users\segam.INTEGRAMED\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BN50FPX1\Kulshrestha V2.doc



11.     **REPRESENTATIONS AND COVENANTS.**

Physician makes the following representations and covenants, the validity of which shall be a material term of this Agreement:

(a)     Physician holds a license, in good standing, and will remain licensed to practice medicine in the jurisdiction of Pennsylvania;

(b)     Physician is authorized by the United States Drug Enforcement Agency to prescribe all pharmaceuticals required in connection with the provision of Infertility Services;

(c)     There are no professional disciplinary proceedings or malpractice actions threatened or pending against Physician, and Physician has notified and will promptly notify PC of any such professional disciplinary proceedings and the dispositions thereof;

(d)     Physician has notified and will promptly notify PC of all malpractice        actions brought

(e)     Physician shall at all times act in compliance with all applicable written policies and procedures of PC as reasonably communicated to Physician, as well as all applicable federal, state, and local laws, rules and regulations.

12.     **CONFIDENTIALITY OF INFORMATION.**

(a)     Physician agrees to keep confidential and not to use or disclose to others (except in connection with the fulfillment of Physician's duties hereunder) any Infertility Information, as defined herein, during the term of this Agreement or during any extension or renewal thereof, and for a period of one (1) year thereafter, except as expressly consented to in writing by PC and Management Company.  For purposes of this Agreement, the term "Infertility Information" shall mean such technical, scientific, and business information provided to Physician by PC or Management Company which is designated by PC or Management Company to be confidential or proprietary.  Infertility Information shall not include information which: (i) is or becomes known in the scientific community through no fault of Physician; (ii) is learned by Physician from a third party legally entitled to disclose such information; or (iii) was already known to Physician at the time of disclosure by PC. Physician further agrees that should his or her contractual relationship hereunder terminate, he or she will neither take nor retain, without prior written authorization from PC and Management Company, any papers, patient lists, fee books, patient record files, or other documents or copies thereof or other Infertility Information of any kind belonging to PC or Management Company, as the case may be.

(b)     Without limiting other possible remedies available to PC for the breach of this covenant, Physician agrees that injunctive or other equitable relief shall be available to enforce this covenant, such relief to be without the necessity of posting bond, cash or



otherwise. Physician further agrees that if any restriction contained in this section is held by any court to be unenforceable or unreasonable, a lesser restriction shall be enforced in its place and remaining restrictions herein shall be enforced independently of each other. The parties further agree that Management Company shall have an independent right to enforce this covenant in its own right.

(c)     It is further understood and agreed that in order to minimize any misunderstanding regarding what information is considered to be confidential or proprietary Infertility Information, PC or Management Company will designate, prior to disclosure to Physician, the specific information which PC or Management Company considers to be proprietary or confidential under this Agreement.

**13.     LIMITS ON CONFIDENTIALITY AGREEMENT.** Nothing in the foregoing Section 12 or elsewhere in this Agreement shall prevent Physician from using any reproductive endocrine or other concepts relating to Infertility Services which are also applicable to non-ART infertility treatment. Furthermore, the restrictions contained in Section 12 shall be of no further force and effect, if this Agreement is terminated as a result of the termination of the Management Agreement.

**14.     RESTRICTIVE COVENANTS, NON-COMPETITION AND OFFERS TO EMPLOYEES.**

(a)     <u>No Solicitation</u>. For 12 months following termination of this Agreement and Physician's employment, Physician agrees not to solicit, directly or indirectly, the business of any person who is or was a patient or client of PC. For purposes of this Section, solicitation shall not include any general advertising in a newspaper of general circulation or other general advertising medium not direct at a specific patient. This covenant is acknowledged by Physician to be based on the fact that the names and addresses of patients and referral sources and the contact persons, contract needs and rates for third-party payers and contracting organizations (all of which are deemed proprietary or confidential Infertility Information hereunder) would not have been known by Physician except by reason of the knowledge thereof gained as an employee or shareholder of PC.

(b)     <u>Covenant Not to Compete</u>. Physician agrees not to compete with the business of PC, in accordance with the terms outlined below:

(i)     The term of the covenant not to compete (the Non-Competition Period") shall be one (1) year after the termination of this Agreement in the event such termination occurs during the Initial Term of this Agreement.

(ii)     The geographic scope of the covenant not to compete is ten (10) miles from any offices ("Non-Compete Area") maintained by PC for the rendition of professional or other medical services to patients during the last twelve months of Physician's employment by PC.

C:\Users\CustomerSlim\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\WU1R5MVN\Kulshrestha V2 red-lined for Mr. Segal 1 6 2014FINAL.docxC:\Users\segam.INTEGRAMED\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BN5OFPX1\Kulshrestha V2.doc



(iii)     During the Non-Competition Period, Physician agrees that she shall not advertise or market Infertility Services, engage in the practice of medicine in which Physician provides Infertility Services, be employed by, be an agent of, act as a consultant for, allow his name to be used by, or have a proprietary interest in, any Medical Practice (as defined below) providing Infertility Services within the Non-Compete Area.

(iv)     For purposes of this Section, the following definitions shall apply:

    (A)     The term "Medical Practice" shall include any form of organization in which Infertility Services are provided to patients of the Medical Practice or of other physicians, including but not limited to a sole proprietorship, a partnership, an association, a professional corporation, a business corporation, or a limited liability partnership or company, a laboratory, an outpatient clinic, a practice management company or medical services organization (or MSO). However, ownership of less than 5% of the outstanding securities of any class of a medical management or managed care organization traded on a national securities exchange or the NASDAQ National Market System will not be deemed to be engaging, solely by reason thereof, in the same business.

    (B)     The term "Infertility Services" shall not prohibit Physician from providing obstetrics and general gynecological services.

(v)     Separability.  If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section is invalid or unenforceable, each Party agrees that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of time within which the judgment may be appealed.

(vi)     Clarification of Scope of Non-Competition Covenant.  This Agreement is not intended to prohibit the personal performance of medical care by Physician on behalf of PC, provided those services are for patients of PC, nor prohibit Physician from fulfilling his contract with PC, nor prohibit the Physician from holding any position on the medical staff of any acute care hospital or the teaching staff of any university.

(vii)     Acknowledgments.  PC and Physician each acknowledges that: (i) the terms set forth in this Section are necessary for the reasonable and proper protection of the interests of PC and the Management Company; (ii) each and every covenant and restriction is reasonable with respect to such matter, length of time and geographical area; (iii) this Agreement, and this Section in particular, shall be enforceable notwithstanding any dispute as to the sums and timing of payments to Physician or other disputes under this Agreement; and (iv) PC has been induced to enter into this Agreement with Physician, in


P-8/14

part, due to the representation by Physician that he will abide by and be bound by the aforesaid covenants and restraints.

(c).     The provisions of Section 14 shall not apply if this agreement is terminated as a result of the PC's actions.

**15.     PUBLICATIONS.**  Physician agrees that any and all abstracts, articles, reviews, or other publications that Physician proposes to submit for publication within the scientific or medical community, or otherwise, which publication is the result of direct support from Management Company, in the form of, including, but not limited to, materials, personnel, data or Facility, as defined in the Management Agreement, or PC resources, Physician will submit to Management Company's President, Reproductive Science Center Division and its Vice President, Medical Affairs, not less than 30 days prior to the proposed submission date, a copy of the proposed article or publication, for Management Company's proprietary review.

**16.     NOTICES.**  Any notice hereunder shall have been deemed given only if in writing and either delivered in hand or sent by registered or certified mail, return receipt requested, postage prepaid, or by United States Express Mail or other commercial expedited delivery services, with all postage and delivery charges prepaid, to the addresses set forth below:

If to Physician:

      Sunita Kulshrestha, M.D.
      2026 Lord Fairfax Road,
      Vienna, VA 22182

Dr. Kulshrestha will provide written notice of her change of address upon her contemplated relocation.

If to PC, at:

      President
      Shady Grove Reproductive Science Center, P.C.
      15001 Shady Grove Road, #400
      Rockville, Maryland 20850

With a copy to:

      Chief Executive Officer

C:\Users\CustomerSlim\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\WU1R5MVN\Kulshrestha V2 red-lined for Mr. Segal 1 6 2014FINAL.docxC:\Users\segam.INTEGRAMED\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BN50FPX1\Kulshrestha V2.doc



Shady Grove Reproductive Science Center, P.C.
15001 Shady Grove Road, #300
Rockville, Maryland 20850


Chief Executive Officer
IntegraMed America, Inc.
Two Manhattanville Road
Purchase, New York 10577


**17.     AMENDMENT.**  No modification, amendment, or addition to this Agreement, nor waiver of any of its provisions, shall be valid or enforceable unless in writing and signed by all parties.

**18.     ASSIGNMENT.**  No assignment of this Agreement or the rights and obligations hereunder shall be valid without the specific written consent of both parties.

**19.     ENTIRE AGREEMENT; MODIFICATION.**  This Agreement contains the entire understanding between the parties and no alteration or modification hereof shall be effective unless contained in a subsequent written instrument executed by both parties hereto.

**20.     APPLICABLE LAW.**  This Agreement shall be governed by the laws of the State of Maryland. Any and all claims, disputes, or controversies arising under, out of, or in connection with this Agreement or any breach thereof, except for equitable relief sought pursuant to Sections 13, 14 and 15, shall be determined by binding arbitration in the State of Maryland, County of Baltimore (hereinafter "Arbitration"). The party seeking determination shall subject any such dispute, claim or controversy to either (i) JAMS/Endispute or (ii) the American Arbitration Association, and the rules of commercial arbitration of the selected entity shall govern. The Arbitration shall be conducted and decided by three (3) arbitrators, unless the parties mutually agree, in writing at the time of the Arbitration, to fewer arbitrators. In reaching a decision, the arbitrators shall have no authority to change or modify any provision of this Agreement. Each party shall bear its own expenses and one-half the expenses and costs of the arbitrators. Any application to compel Arbitration, confirm or vacate an arbitral award or otherwise enforce this Paragraph shall be brought in the Courts of the State of Maryland.

**21.     SEVERABILITY.**  Each provision in this Agreement is intended to be severable, and may be modified by any court of competent jurisdiction to the extent necessary to make such provision valid and enforceable. If any term or provision hereof shall be determined by a court of competent jurisdiction to be illegal or invalid for any reason whatsoever in whole or in part, such provision or portion thereof shall be severed from this Agreement and shall not effect the validity of the remainder of this Agreement.



22.    WAIVER; CONSENT.    No consent or waiver, express or implied, by either party hereto, or of any breach or default by the other party in the performance by the other of its obligations hereunder, shall be valid unless in writing, and no such consent or waiver shall be deemed or construed to be a consent or waiver to or of any other breach or default on the performance by such other party of the same or any other obligation of such party hereunder. Failure on the part of either party to complain of any act or failure to act of the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder. The granting of any consent or approval in any other instance by or on behalf of Physician and/or PC shall not be construed to waive or limit the need for such consent in any other or subsequent instance.

23.    FURTHER ACTION.    Each party hereto agrees that it will execute and deliver such further instruments and will take such further action as may be necessary to discharge, perform or carry out any of its respective obligations and agreements hereunder.

24.    Protection of Former Employer Information and Disclosure of Any Restrictions. Similar to the protections being afforded PC through this Agreement, Physician agrees not to improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer and will not bring onto PC's premises any unpublished document or proprietary information belonging to any such employer unless consented to by such employer. Further, Physician agrees to inform PC of any restrictions on Physician which may limit Physician's ability to perform services for PC's patients.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date first above written.

Shady Grove Fertility Center of PA, PLLC.

By: _____ (Seal)    Date: 1/15/14
Mark R. Segal, CEO

Physician:

_____ H.D. (Seal)    Date: 1/15/14
Sunita Kulshrestha, MD

## SCHEDULE A

### Office Locations

**CHESTERBROOK**
945 Chesterbrook Blvd
Chesterbrook, PA 19087

**BALA CYNWYD**
555 City Line Ave
Suite 1170
Bala Cynwyd, PA 19004

## SCHEDULE B

### COMPENSATION and BENEFITS

C:\Users\CustomerSlim\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\WU1R5MVN\Kulshrestha V2 red-lined for Mr. Segal 1 6 2014FINAL.docxC:\Users\segam.INTEGRAMED\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BN50FPX1\Kulshrestha-V2.doc

SK P.12/14

| | | Jul-14 | Jan-15 | Jan-16 | Jan-17 | Jan-18 |
|---|---|---|---|---|---|---|
| **SALARY & BONUS:** | | | | | | |
| 1st Year | Base Salary (a) | $ 275,000 | | | | |
| | ** Bonus - 5% of POR collections > $250,000 | $ 25,000 | | | | |
| | ** Bonus - 1% of POS charges > $1,000,000 | $ 20,000 | | | | |
| 2nd Year | Base Salary | | $ 300,000 | | | |
| | ** Bonus - 10% of POR collections > $1,000,000 | | $ 50,000 | | | |
| | ** Bonus - 1% of POS charges > $1,000,000 | | $ 20,000 | | | |
| 3rd Year | Base Salary | | | $ 300,000 | | |
| | ** Bonus - 15% of POR collections > $1,500,000 | | | $ 75,000 | | |
| | Bonus - 1% of POS charges > $1,000,000 | | | $ 20,000 | | |
| 4th Year | Base Salary | | | | $ 300,000 | |
| | ** Bonus - 20% of POR collections > $2,000,000 | | | | $ 100,000 | |
| | Bonus - 1% of POS charges > $1,000,000 | | | | $ 20,000 | |
| 5th Year | Base Salary | | | | | $ 325,000 |
| | ** Bonus - 25% of POR collections > $2,500,000 | | | | | $ 125,000 |
| | Bonus - 1% of POS charges > $1,000,000 | | | | | $ 20,000 |
| **VACATION / CME:** | | | | | | |
| 6 weeks | | $ 21,154 | | | | |
| 6 weeks | | | $ 28,846 | | | |
| 6 weeks | | | | $ 34,615 | | |
| 6 weeks | | | | | $ 34,615 | |
| 6 weeks | | | | | | $ 37,500 |
| Accrues at the beginning of each year | | | | | | |
| **SICK DAYS:** | | | | | | |
| Accrue 5 days per year | | $ 5,288 | $ 5,769 | $ 5,769 | $ 5,769 | $ 6,250 |
| 20 days sick time may be accrued | | | | | | |
| **PAYROLL TAXES:** | | | | | | |
| FICA | | $ 3,895 | $ 3,895 | $ 3,895 | $ 3,895 | $ 3,895 |
| Medicare | | $ 3,988 | $ 4,350 | $ 4,350 | $ 4,350 | $ 4,713 |
| **HEALTH INSURANCE** | | | | | | |
| Aetna PPO (family coverage) | | $ 11,000 | $ 11,000 | $ 11,000 | $ 11,000 | $ 11,000 |
| Guardian Dental | | $ 980 | $ 980 | $ 980 | $ 980 | $ 980 |
| **DISABILITY INSURANCE** | | | | | | |
| > 9/week | | | | | | |
| Long-term | | $ 696 | $ 696 | $ 696 | $ 696 | $ 696 |
| Coverage up 60% of salary (max $7,300pm) | | | | | | |
| **RETIREMENT (Defined Benefit) PLAN** | | | | | | |
| >1000hrs in plan year after 1st year | | $ - | $ 15,000 | $ 30,000 | $ 30,000 | $ 30,000 |
| **CAR ALLOWANCE** | | | | | | |
| Lease pmts, gas, insurance, R&M, cell phone | | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 |
| **DUES & EDUCATION ALLOWANCE** | | | | | | |
| Dues, seminars, travel & accommodation | | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 |
| **RELOCATION ALLOWANCE** | | | | | | |
| Moving expenses, etc | | $ 5,000 | | | | |
| **SIGNING BONUS (to be paid on start date)** | | $ 25,000 | | | | |
| | (b) | $ 406,001 | $449,536 | $495,306 | $ 520,306 | $ 574,034 |

Total to equal $30,000
(Exl May also be $10,000 moving expenses
$ 1,20,000
signing bonus )
( st. 1/15/19 )

(a) Represents annual compensation & bonus milestones and will be prorated for a partial year

(b) This total does not include an anticipated physician productivity bonus
Physician of Service bonus is capped at 25% of base salary
There is no cap for the Physician of Record bonus

** Bonuses are estimated based typical physician performance

## 2013 BENEFIT PLANS & PROGRAM SUMMARY

C:\Users\CustomerSlim\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\WU1P9MVN\Kulshrestha V2 redlined for Mr. Segal 1 6 2014FINAL.docxC:\Users\sogan.INTEGRAMED\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BB50FPN1\Kulshrestha V2.doc



*Eligibility: Regular, Full Time employees. Benefits begin the 1st day of employment. Dependent and Family coverage is available.*

**HEALTH INSURANCE (Aetna)**  **DENTAL INSURANCE (Guardian)**  **VISION**
**INSURANCE (VSP)**
Biweekly Cost:

| * Health Savings Account (HSA) | * Platinum Dental Plan | *Choice Vision Plan |
|---|---|---|
| $ 20.53  Single coverage | $ 2.98  Single coverage | $ 3.17  Single coverage |
| $ 129.49  Employee & Spouse | $ 10.53  Employee & Spouse | $ 5.33  Employee & Spouse |
| $ 98.81  Employee & Children | $ 16.18  Employee & Children | $5.44  Employee & Children |
| $ 292.34  Family | $ 26.81  Family | $ 8.77  Family |

**LIFE INSURANCE**
*Eligibility: Employees working 30 hours or more. Benefits begin 1st day of employment.*
- ➤ Carrier: Guardian; Group coverage at no cost to employees
- ➤ Term Insurance - two times annual salary to a maximum of $500,000
- ➤ This plan provides an Accidental Death & Dismemberment (AD&D) benefit of one times the death benefit
- ➤ Voluntary Term Life and AD&D Insurance coverage may also be purchased for self, spouse and dependent(s)

**LONG TERM DISABILITY INSURANCE**
*Eligibility: Employees working 30 hours or more. Benefits begin 1st day of employment.*
- ➤ Carrier: Guardian; Coverage at no cost to employees
- ➤ Benefits payable at 60% of your basic monthly earnings to a maximum of $7,300/month
- ➤ Benefits begin on the 91st day of absence

**VOLUNTARY SHORT TERM DISABILITY**
*Eligibility: Employees working 30 hours or more. Benefits begin 1st day of employment.*
- ➤ Carrier: Guardian; Benefits begin on the 8th day following an accident or illness
- ➤ Pays 60% of your weekly earnings to a maximum of $1,000/week; 13 week benefit with 12 month waiting period on pre-existing condition

**DEFINED BENEFIT PLAN**
*Eligibility: Any physician employee working >1000 hrs /yr following one calendar year of employment.*
- ➤ Practice Contribution:
  - o Eligible Yr 1: $15,000
  - o Eligible Yr 2+ : $30,000

**PAID LEAVE**
*Eligibility: All full time employees upon the completion of the 90-day Introductory Period.*
- ➤ Vacation/CME: 6 weeks
- ➤ Sick: 5 days (up to 20 days may be accrued)

**PHYSICIAN DISCRETIONARY (YELLOW SHEET) ALLOWANCE**
*Eligibility: Physician employees working 30 hours or more.*
- ➤ Benefit of up to $9,000 per annum for business related and approved expenses including a car lease, maintenance and repair, use of cell phone, dues, subscription, seminars, meals, travel & accommodation, etc.





shady grove fertility

August 30, 2021

Sunita Kulshrestha, M.D.,

Dear Sunita,

As has been discussed, pursuant to your Employment Agreement dated January 15, 2014, notice is hereby provided that your employment with Shady Grove Reproductive Science Center, P.C. will terminate on February 27, 2022. As we have further discussed with you, we expect that you will continue to perform your duties under your agreement throughout this period, and ensure that patient care and compliance with SGF policies and procedures are your top priorities. Should these expectations not be met, we reserve the right to terminate you sooner pursuant to your Employment Agreement.

Sincerely,

Amy Davis
Regional Executive Director
On behalf of Shady Grove Fertility

EXHIBIT
B
ALL-STATE LEGAL